**AFFIRMED and Opinion Filed March 19, 2024**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

**No. 05-22-00635-CV**

**INTELITRAC, INC., Appellant**
**V.**
**UMB FINANCIAL CORPORATION, UMB BANK, N.A., ZACH FEE, NICK ARTHACHINDA, AND KEVIN VON ATZIGEN, Appellees**

**On Appeal from the 95th District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-17-00035**

## MEMORANDUM OPINION

Before Chief Justice Burns, Justice Carlyle, and Justice Kennedy
Opinion by Chief Justice Burns

Appellant InteliTrac, Inc. appeals from the trial court's final judgment in favor of appellees UMB Financial Corporation, UMB Bank, N.A., Zach Fee, Nick Arthachinda, and Kevin Von Atzigen.[1] In three issues, InteliTrac argues that (1) the trial court erred in granting summary judgment in favor of appellees on InteliTrac's claims for promissory estoppel, breach of fiduciary duty and constructive fraud, negligent misrepresentation, fraud, and conspiracy; (2) the trial court erred in

---

[1] We will refer to appellees collectively as appellees, to UMB Financial Corporation and UMB Bank, N.A. as UMB, and to Zach Fee, Nick Arthachinda, and Kevin Von Atzigen as the UMB employees.

allowing UMB to pursue attorney's fees in defense of InteliTrac's claim for violations of the Texas Deceptive Trade Practices Act (DTPA) because UMB failed to timely seek such fees; and (3) the evidence is legally insufficient to support the jury's verdict, and the trial court's award, of attorney's fees in the amount of $430,000. Because we conclude InteliTrac failed to raise a genuine issue of material fact as to each of the challenged elements in response to appellees' motion for summary judgment, UMB timely sought attorney's fees for defending against InteliTrac's DTPA claim, and the evidence was legally sufficient to support the trial court's award of attorney's fees, we affirm.

### Background

InteliTrac is a defense contractor for the United States government that specializes in software, database development, and personnel solutions. UMB Financial Corporation is a financial services holding company that offers banking and other financial services nationwide through its subsidiaries. UMB Bank, N.A. is one such subsidiary, and the individually named appellees are employees of UMB Bank. Specifically, Fee was the President of UMB's Texas Region, Arthachinda was the Vice President of UMB's Capital Markets Group, and Von Atzigen was a Senior Portfolio Manager with the commercial lending team.

In August 2014, InteliTrac sought to merge with DECO, another defense contractor that provided law enforcement and military training, security solutions, and specialized technical services to the United States government and its allies.

Negotiations occurred for several months. In order to finalize the merger and acquisition with DECO, InteliTrac sought to obtain a $20 million loan from UMB through one of its loan officers, Steve White. InteliTrac's CEO, Marc Gunderson, had become friends with White earlier in 2014, and Gunderson, along with several other individuals, had previously obtained a loan from UMB, through White, for another unrelated entity, the Medicine Store. On July 2, 2015, InteliTrac and DECO signed a Letter of Intent and Stock Purchase Agreement, which provided that InteliTrac was to purchase all of DECO's outstanding shares for approximately $31 million. The Stock Purchase Agreement was conditioned on InteliTrac securing financing. White handled the loan application at issue up until he was removed by UMB in between September 14 and 18, 2015, over a year after the loan process had begun.

During the application process, InteliTrac managed and invested in DECO in anticipation of the merger and restructuring of the companies. Representatives from InteliTrac, DECO, and UMB met on several occasions to discuss InteliTrac's and DECO's financials, the merger, and the loan terms and structure. The loan process was delayed on several occasions. Initially, the agreement between InteliTrac and DECO required the loan to be finalized by September 11, 2015. When that was not possible, InteliTrac paid DECO $400,000 to extend the deadline to September 30, 2015. The loan was not submitted to the loan committee for final approval until September 24, and the committee denied the loan. According to InteliTrac, the loan

presentation was incomplete and incorrect and InteliTrac was not notified of the declination until September 29, leaving it no time to try and salvage the merger agreement. DECO refused to further extend the deadline, and the merger never occurred.

InteliTrac filed suit against appellees generally alleging that appellees repeatedly told InteliTrac that the loan was approved when it knew it would ultimately be denied. Specifically, IntelTrac brought claims for breach of fiduciary duty, breach of good faith and fair dealing, fraud, negligent misrepresentation, negligence, breach of contract, conspiracy, and promissory estoppel. Appellees filed a general denial and made a general request for attorney's fees. UMB later added a counterclaim for a declaratory judgment regarding whether a valid and enforceable agreement was formed and whether certain conditions precedent were met. In conjunction with its counterclaim, UMB sought attorney's fees under section 37.009 of the Texas Civil Practice and Remedies Code. On the same day UMB filed its counterclaim, InteliTrac filed an amended petition adding claims for violating the DTPA and constructive fraud.

Appellees filed two separate motions for summary judgment. One was filed by UMB, and one was filed by the UMB employees. UMB moved for summary judgment on each of InteliTrac's causes of action, arguing that several of InteliTrac's

claims failed because they did not satisfy the Statute of Frauds,[2] that some were not actionable as a matter of law, and that the remaining lacked evidence or were contradicted by evidence and the law. The UMB employees moved for summary judgment on all claims as well, arguing that they were not liable in their individual capacities because all alleged acts were performed in the scope of their employment with UMB, and on the grounds asserted in UMB's motion. They also incorporated and adopted the facts, arguments and authorities, and evidence contained in UMB's motion. The combined appellees filed a supplemental motion, InteliTrac filed a single response, and appellees filed a reply, along with objections to certain exhibits relied upon by InteliTrac. After a hearing,[3] the trial court entered an order sustaining all but one of UMB's evidentiary objections, another order granting UMB's motion for summary judgment on each of InteliTrac's causes of action, and a third order granting the UMB employees' motion for summary judgment on each of InteliTrac's causes of action. InteliTrac filed a motion for reconsideration, which the trial court denied and InteliTrac does not challenge on appeal.

---

[2] The Statute of Frauds provides that a loan agreement for more than $50,000 is not enforceable unless the agreement is in writing and signed by the party to be bound or by that party's authorized representative. TEX. BUS. & COM. CODE ANN. § 26.02(b).

[3] A transcript of the hearing is not included in the appellate record. On appeal, InteliTrac claims it orally nonsuited four of its nine causes of action at the summary judgment hearing: breach of contract, breach of duty of good faith and fair dealing, negligence, and violation of the DTPA. There is no notice or order of nonsuit in the record as to these four claims; however, the final judgment indicates InteliTrac nonsuited its DTPA claim. Regardless, InteliTrac does not challenge the trial court's grant of summary judgment on these four claims.

Prior to the trial court signing its order denying InteliTrac's motion for reconsideration, the parties signed a Rule 11 agreement in which UMB agreed to nonsuit its declaratory judgment counterclaim and not pursue attorney's fees for that claim. Instead, UMB planned to pursue attorney's fees under the DTPA. UMB then filed an amended counterclaim seeking recovery of its attorney's fees in defending against InteliTrac's DTPA claim. Within its amended counterclaim, UMB also nonsuited its declaratory action and claim for attorney's fees under section 37.009. By separate motion, including a brief in support, UMB moved to recover attorney's fees under the DTPA on the basis that the claim was groundless and was brought in bad faith or for the purpose of harassment.

InteliTrac responded and moved to strike UMB's counterclaim as being untimely filed. The trial court denied the motion to strike and granted UMB's motion to recover attorney's fees. Ultimately, the issue of the amount of attorney's fees to be awarded to UMB was presented to a jury. The jury found that $430,000 was reasonable and necessary, and the trial court entered a final judgment against InteliTrac awarding UMB attorney's fees in the amount of $430,000, costs, and post-judgment interest.

InteliTrac filed a motion for judgment notwithstanding the verdict or, alternatively, a motion for new trial. The trial court denied InteliTrac's motion, and this appeal followed.

## Summary Judgment

### A. Standard of Review

We review a summary judgment de novo. *Trial v. Dragon*, 593 S.W.3d 313, 316 (Tex. 2019). When a motion for summary judgment contains grounds for both a traditional summary judgment and no-evidence summary judgment, we consider the no-evidence ground first. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004).

A party, after adequate time for discovery, may move for summary judgment without presenting evidence on the ground that there is no evidence of one or more essential elements of a claim or defense on which the adverse party has the burden of proof. TEX. R. CIV. P. 166a(i). To defeat a no-evidence motion, the nonmovant must produce evidence raising a genuine issue of material fact on the essential elements of the claim or defense challenged. *Ridgway*, 135 S.W.3d at 600. A nonmovant raises a genuine issue of material fact if it produces more than a scintilla of evidence establishing the existence of the challenged element. *Id.* If the nonmovant fails to produce more than a scintilla of evidence, there is no need to determine whether the movant established it was entitled to summary judgment on those claims or defenses under traditional grounds. *Id.*

A traditional motion for summary judgment requires the moving party to show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Lujan v. Navistar, Inc.*, 555 S.W.3d 79, 84

(Tex. 2018). If the movant carries this burden, the burden shifts to the nonmovant to raise a genuine issue of material fact. *Lujan*, 555 S.W.3d at 84. We take evidence favorable to the nonmovant as true, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Ortiz v. State Farm Lloyds*, 589 S.W.3d 127, 131 (Tex. 2019).

A defendant is entitled to summary judgment on a plaintiff's cause of action if the defendant conclusively negates at least one essential element of the plaintiff's cause of action or conclusively establishes all the elements of an affirmative defense as a matter of law. *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 79 (Tex. 2015). We must affirm the summary judgment if any ground asserted in the motion, and preserved for appellate review, is meritorious. *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 157 (Tex. 2004).

## B. Analysis

On appeal, InteliTrac challenges the trial court's grant of summary judgment in favor of appellees on InteliTrac's claims for breach of fiduciary duty and constructive fraud, negligent misrepresentation, promissory estoppel, fraud, and conspiracy. Generally, InteliTrac's claims centered on White's and other UMB employees' representations that the loan would be funded, the final committee vote was just a "rubber stamp," and there was no reason to look for funding elsewhere, as well as appellees' failure to disclose material information such as White's inability to handle the loan application and negative feedback and statements from

–8–

UMB personnel that would have indicated the loan would not be funded. We address each cause of action in turn.

### 1. Breach of Fiduciary Duty and Constructive Fraud

To prove a cause of action for breach of fiduciary duty, a plaintiff must establish that a fiduciary relationship, and thus fiduciary duty, existed between the plaintiff and the defendant, the defendant breached its fiduciary duty to the plaintiff, and the breach caused injury to the plaintiff or a benefit to the defendant. *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.—Dallas 2006, pet. denied); *see also First United Pentecostal Church v. Parker*, 514 S.W.3d 214, 220–21 (Tex. 2017). Constructive fraud is the breach of a legal or equitable duty, which the law declares fraudulent because it either violates a fiduciary relationship or because of its tendency to deceive others, to violate confidences, or cause injury to public interests. *Tex. Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 366 (Tex. App.—Dallas 2009, pet. denied) (op. on reh'g). A fiduciary relationship may be formal, such as an attorney–client or trustee relationship, or informal. *Blume*, 196 S.W.3d at 447. An informal relationship may give rise to a fiduciary duty when one person trusts in and relies upon another. *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 176 (Tex. 1997). However, to impose an informal fiduciary relationship in a business transaction, a special relationship of trust and confidence must exist prior to, and separate from, the parties' agreement. *Blume*, 196 S.W.3d at 447 (citing *Schlumberger*, 959 S.W.2d at 177). "[N]ot every

relationship involving a high degree of trust and confidence rises to the stature of a fiduciary relationship." *Schlumberger*, 959 S.W.2d at 176–77. Generally, a fiduciary relationship does not exist between a borrower and a lender; however, the relationship can develop into a fiduciary one where the lender exercises excessive control over, or influence in, the borrower's business activities. *Tex. Champps Americana, Inc. v. Comerica Bank*, 643 S.W.3d 738, 748 (Tex. App.—Dallas 2022, pet. denied); *Farah v. Mafrige & Kormanik, P.C.*, 927 S.W.2d 663, 675 (Tex. App.—Houston [1st Dist.] 1996, no writ).

Appellees argued in their motion for summary judgment that they were entitled to judgment as a matter of law on InteliTrac's causes of action for breach of fiduciary duty and constructive fraud because InteliTrac had no evidence that appellees exercised excessive control or influence over InteliTrac and, thus, no evidence a fiduciary relationship existed between InteliTrac and appellees. Appellees further argued that InteliTrac's claim of an alleged "past banking relationship" and "personal relationship" were not enough to establish a fiduciary relationship.

In response, InteliTrac argued that a material fact issue existed on whether a fiduciary relationship existed between the parties. InteliTrac claimed that the one-year relationship of advice, dependence, appellees' control, and trust evidenced a fiduciary and special relationship. To support such argument, InteliTrac relied on the following evidence:

- Gunderson (InteliTrac's CEO) and White (UMB loan officer) were friends and had known each other since 2014;

- Gunderson was a new client that White brought to UMB;

- Gunderson was a personal guarantor on a previous loan he and others acquired from UMB, of which UMB senior management was aware and of which White was the loan officer;

- UMB met with InteliTrac and DECO regarding their proposed merger in September 2014, and, during the same trip, met with the owners involved in the previous loan;

- a version of the InteliTrac loan was in underwriting as of UMB's Texas Region's September 29, 2014 meeting;

- White opened a commercial credit file for InteliTrac on October 28, 2014;

- Gunderson's affidavit testimony that White, Jon Musmecci, Jim Sangster, and Craig Anderson (UMB employees) offered to provide services related to the DECO loan including rendering business advice about how to structure the transaction and the loans and what financial information was required to obtain loan approval;

- Gunderson's affidavit testimony that UMB solicited government accounts receivable for collateral for the loan;

- Gunderson's affidavit testimony that UMB advised InteliTrac that it was not just a borrower; they were partners, and UMB would be a debt facility partner—UMB would hold the debt and InteliTrac would hold the equity;

- Gunderson's affidavit testimony that Nick Arthachinda, Vice President of UMB's Capital Markets Group, offered to invest equity in InteliTrac through Mezzanine debt; and

- Gunderson's affidavit testimony that White and Musmecci exerted control by asking InteliTrac to stop seeking financing for the loan from other banking institutions based on their confidence that the UMB loan would be approved.

–11–

The remaining statements InteliTrac made in its response to support its claim that a fiduciary or special relationship existed between the parties are either not supported by evidence, the evidence referenced does not support the statement, the evidence cannot be found at the provided exhibit reference, or the trial court sustained UMB's objection to the evidence and InteliTrac has not challenged the trial court's evidentiary rulings on appeal.[4]

We conclude that the above evidence does not raise a genuine issue of material fact as to whether a fiduciary relationship existed before and apart from the agreement at issue. The fact that Gunderson and White were friends and Gunderson

---

[4] InteliTrac's summary judgment response motion contained a five-page summary, a sixty-three-page fact section, a fifty-seven-page argument section, and 115 exhibits. Most of the references to evidentiary support in the argument section are references back to individual paragraphs in the fact section, which then referenced the attached exhibits. Many times, the references to either the individual paragraphs or the attached exhibits do not match the argument asserted. As we have recently explained, the trial court is not required to sift through a voluminous response and its exhibits to find the evidence that raises a fact question:

> In determining whether a summary judgment respondent successfully carried its burden, neither this court nor the trial court is required to wade through a voluminous record to marshal respondent's proof. Thus, when presenting summary-judgment proof, a party must specifically identify the supporting proof on file that it seeks to have considered by the trial court. Therefore, "in responding to a no-evidence motion for summary judgment, one must do more than itemize the evidence and then, in a section totally separate from the recitation of the evidence, offer general conclusions that the above evidence conclusively establishes each element of the plaintiff's claims." In other words, the nonmovant is "obligated to point out with specificity where in his filings there was evidence on each of the challenged elements of his claims."

*Landero v. Future Healthcare Sys., Inc.*, No. 05-21-00881-CV, 2023 WL 4571925, at *2 (Tex. App.—Dallas July 18, 2023, no pet.) (mem. op.) (internal citations omitted); *see also Parkchester Holdings, Inc. v. Carrier Corp.*, No. 05-04-00912-CV, 2005 WL 995357, at *3 (Tex. App.—Dallas Apr. 29, 2005, no pet.) (mem. op.) ("A party responding to a no-evidence motion for summary judgment has the burden of pointing out to the trial court where the issues raised in its response can be found in its offered evidence."). Thus, evidence not relied on and cited to by InteliTrac in its summary judgment response to a challenged element is not included in our review of whether InteliTrac raised a genuine issue of material fact as to that element.

was a personal guarantor on a previous business loan, along with multiple other individuals, is not evidence of a prior special relationship. *See Meyer v. Cathey*, 167 S.W.3d 327, 331 (Tex. 2005) (per curiam) (concluding four-year friendship and work together on prior projects did not create a fiduciary relationship). The earlier loan was an "arms-length transaction[] entered into for the parties' mutual benefit, and thus do[es] not establish a basis for a fiduciary relationship." *Id.* Furthermore, "mere subjective trust does not, as a matter of law, transform arm's-length dealing into a fiduciary relationship." *Schlumberger*, 959 S.W.2d at 177.

Additionally, Gunderson's testimony that UMB employees offered to render advice on how to structure the loan, explain what was needed for loan approval, solicit collateral for the loan, or even invest equity, is not evidence that appellees exercised excessive control over, or influence in, InteliTrac's general business activities. Neither is Gunderson's testimony that UMB employees asked InteliTrac to stop seeking alternative financing. *See, e.g.*, *PlainsCapital Bank v. Reaves*, No. 05-17-01184-CV, 2018 WL 6599020, at *4 (Tex. App.—Dallas Dec. 17, 2018, pet. denied) (mem. op.) (concluding evidence that banker gave plaintiff business advice regarding her company over several years, including changing from the cash method to the accrual method, capitalizing the company's software development costs as an asset, selling her personal securities holding to infuse additional capital, layering the company's loans by obtaining a revolving line of credit and term note, securing a lock box for the revolving line of credit, and pledging the proceeds from her

–13–

husband's life insurance policy as collateral was insufficient to support the trial court's determination that a fiduciary relationship existed between the parties). Therefore, InteliTrac failed to meet its summary judgment burden as to appellees' no-evidence challenge, and the trial court did not err in granting summary judgment on InteliTrac's claims for breach of fiduciary duty or constructive fraud.

## 2. Negligent Misrepresentation and Fraud

To prove a cause of action for negligent misrepresentation, the plaintiff must show that the defendant made a representation in the course of its business or in a transaction in which it had a pecuniary interest, the representation conveyed false information for the guidance of others in their business, the defendant did not exercise reasonable care or competence in obtaining or communicating the information, and the plaintiff justifiably relied on the representation causing the plaintiff to suffer pecuniary loss. *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653–54 (Tex. 2018). "Significantly, the sort of 'false information' contemplated in a negligent misrepresentation case is a misstatement of *existing fact*," not a promise of future conduct. *AKB Hendrick, LP v. Musgrave Enters., Inc.*, 380 S.W.3d 221, 237 (Tex. App.—Dallas 2012, no pet.) (emphasis in original) (quoting *Airborne Freight Corp., Inc. v. C.R. Lee Enters., Inc.*, 847 S.W.2d 289, 294 (Tex. App.—El Paso 1992, writ denied)).

To prove a cause of action for fraud, a plaintiff must show that the defendant made a material representation, the representation was false, the defendant knew the

representation was false when he made it or the defendant recklessly made the misrepresentation as a positive assertion without any knowledge of its truth, the defendant intended to induce the plaintiff to act upon the representation, and the plaintiff actually and justifiably relied on the representation, thereby causing the plaintiff injury. *Orca Assets*, 546 S.W.3d at 653; *Esty v. Beal Bank S.S.B.*, 298 S.W.3d 280, 303 (Tex. App.—Dallas 2009, no pet.). "Although similar in their essential elements, fraud is more difficult to prove than negligent misrepresentation 'due to the added element of intent to deceive.'" *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 921 (Tex. 2010) (quoting *Richter, S.A. v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 939 F.2d 1176, 1185 (5th Cir. 1991)). Therefore, to succeed on a fraud claim, a plaintiff must establish that the defendant acted with fraudulent intent. *Tex. Integrated Conveyor Sys.*, 300 S.W.3d at 366.

Unlike negligent misrepresentation, "[a] promise of future performance can be the basis of an actionable fraud claim if the promise was made with no intention of performing at the time it was made." *AKB Hendrick*, 380 S.W.3d at 233. A claim for fraud can also be shown by establishing that the defendant had a duty to disclose and failed to disclose. *Schlumberger*, 959 S.W.2d at 181. Specifically, the plaintiff must establish that the defendant failed to disclose material facts, the defendant had a duty to disclose such facts to the plaintiff, the plaintiff was ignorant of the facts and did not have an equal opportunity to discover such facts, the defendant intended the plaintiff to act or refrain from acting based on its disclosure, and the plaintiff

–15–

relied on the nondisclosure resulting in injury. *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 219–20 (Tex. 2019).

Appellees argued they were entitled to summary judgment on InteliTrac's claim against them for negligent misrepresentation because InteliTrac could not establish the existence of an actionable representation, i.e. a representation of an existing fact versus a promise of future conduct, or that it justifiably relied on such representation. Specifically, appellees asserted that the alleged representation that the loan would be approved is not actionable because it concerned a future event, not an existing fact. Appellees also contended that InteliTrac could not justifiably rely on such representations when there were red flags indicating reliance was unwarranted.

InteliTrac responded that it had ample evidence to support its claim and the existence of actionable representations on which it justifiably relied. Specifically, InteliTrac argued that appellees made the following statements of existing fact: the deal was already approved in Texas and by Fee, the loan committee members previewed and approved the loan, there was no need to seek alternate financing, and the loan presentation package was done but system failures delayed the agenda. InteliTrac also asserted that its board's actions demonstrated reasonable reliance on appellees' representations.

As to InteliTrac's traditional fraud claim, appellees argued in their motion for summary judgment that InteliTrac had no evidence that, even if appellees made

alleged promises of a future loan approval, appellees knew the representations were false or made the representations with the intent to deceive InteliTrac. Appellees also again argued there was no evidence of justifiable reliance.

InteliTrac argued in its response that "UMB was on actual notice that senior loan officer White was making false statements to InteliTrac and was sending them internal Opportunity Memos as early as May 2015 to induce reliance." InteliTrac asserted that appellees made the following promises of future actions: the promise of a formal approval by UMB's loan committee, the promise that a commitment letter would be signed, and the promise that the loan would be closed by September 30, 2015. InteliTrac also argued that, in reliance on appellees' representations, it expended large sums of money in due diligence and to finalize the Stock Purchase Agreement with DECO.

Because it is dispositive to our review of the trial court's summary judgment ruling, we first address whether InteliTrac raised a genuine issue of material fact with respect to the element of justifiable reliance for both its negligent misrepresentation claim and its traditional fraud claim. We conclude InteliTrac failed to bring forth evidence that it justifiably relied on any alleged representations when it decided to pay the $400,000 to extend the deadline, when it decided not to pursue alternative financing, and when it continued to pursue the loan with UMB.

In the portion of its motion responding to appellee's challenge to the element of justifiable reliance, InteliTrac asserted, "Gunderson and InteliTrac's board's

actions demonstrate a reasonable reliance upon UMB's inducements and representations. The evidence is *that other experienced parties involved with [InteliTrac] relied on UMB's representations . . . ."* Except for evidence that InteliTrac paid DECO $400,000 on September 11, 2015, to extend the closing date until September 30, 2015, InteliTrac did not cite to any evidence showing that Gunderson or InteliTrac's board acted in response to UMB's representations. Instead, the evidence InteliTrac produced showed that DECO was "expending extensive resources and conducting extensive due diligence," and thus, "[i]t was important for [Jeff Gibson (Deco's CEO)] to hear [at the June 2015 meeting] that UMB approved the loan." Gibson had agreed to continue in a management role when the companies merged. Gibson's, and thus DECO's reliance on representations made at the June 2015 meeting, however, is not evidence of InteliTrac's reliance. And InteliTrac's argument that it paid $400,000 for the extension because White told Gunderson the loan approval process was delayed due to technical failures is belied by its own evidence. The summary judgment evidence shows that InteliTrac and DECO agreed to the extension on September 11, four days prior to White's representation that the loan did not go to committee on September 15 due to "system issues."

Furthermore, there can be no dispute that InteliTrac knew the loan was not final until it was approved by the committee. The summary judgment evidence shows that InteliTrac, specifically Gunderson and his son Will, knew that the deal

was not complete in June and that the loan had to be approved by the loan committee before it was final. Even after InteliTrac paid the $400,000 to extend the deadline and White was removed, InteliTrac and its investors knew that the loan was not guaranteed. This is evidenced by two emails (cited to by InteliTrac in the fraud section of its response) sent from Steve Koenig, an investor, to other investors, as well as to Gunderson and Eric Powers (InteliTrac's Director of Finance), after Musmecci took over the loan presentation. The first is a September 16, 2015 email in which Koenig advised the group that he spoke with Musmecci who said that he was taking over the loan process, would keep Koenig informed as the process moved forward, liked the deal, assured Koenig that the process would be expedited, and "*pending the loan committee's approval*, will not have any problem having the deal closed and funded by September 30, 2015." (emphasis added). Koenig concluded his email by stating Musmecci "sounded confident, let's hope they deliver." The second is a Tuesday, September 22 email from Koenig to the group advising that he received an update from Musmecci that the loan package was completed and would go to committee on Thursday. Koenig further advised that Musmecci "assured [him] that they would meet the 30th deadline" and that Musmecci would be pre-meeting with three of the committee members Wednesday. The email concluded, "The wait continues . . . ."

Additionally, appellees' summary judgment evidence showed that Gunderson was a seasoned entrepreneur with prior acquisition and sales experience and had

been through the loan process with UMB before. White and InteliTrac exchanged multiple draft Opportunity Memos, including at least one draft to which an InteliTrac representative made suggested changes. Thus, the summary judgment evidence established that the parties had ongoing discussions regarding the terms and structure of the loan request and that InteliTrac understood that the loan would not become final until presented to and approved by the committee. "Such actions do not signify a deal; they constitute negotiations." *Bluebonnet Sav. Bank, F.S.B. v. Grayridge Apartment Homes, Inc.*, 907 S.W.2d 904, 909 (Tex. App.—Houston [1st Dist.] 1995, writ denied).

Therefore, no matter what assurances were made leading up to the loan presentation, the evidence established InteliTrac understood the loan could not be finally approved and funded until the loan request was presented and the committee members voted to approve it. While the element of justifiable reliance is generally a question of fact, it can be negated as a matter of law when circumstances exist under which reliance cannot be justified. *Orca Assets*, 546 S.W.3d at 654. The summary judgment evidence here presents such circumstances. InteliTrac "needed to protect its own interests through the exercise of ordinary care and reasonable diligence rather than blindly relying upon another party's vague assurances. Its failure to do so precludes its claim of justifiable reliance as a matter of law." *Id.* at 660. As such, the trial court did not err in granting summary judgment in favor of appellees on InteliTrac's claims of negligent misrepresentation and traditional fraud.

We next turn to InteliTrac's fraud by nondisclosure claim. Appellees asserted in their motion for summary judgment that InteliTrac could not establish appellees had a duty to disclose. A duty to disclose arises in four circumstances: (1) a fiduciary or other special relationship between the parties gives rise to a duty to disclose; (2) newly discovered information makes a defendant's earlier representation misleading or untrue; (3) a defendant conveys a false impression by making a partial disclosure; and (4) a defendant who voluntarily discloses some information has a duty to disclose the whole truth. *Bombardier Aerospace*, 572 S.W.3d at 220. Because we have already determined there was no fiduciary or special relationship between the parties, our review will focus on InteliTrac's arguments and evidence that a duty arose under one of the remaining three circumstances.

As to the second circumstance, InteliTrac listed several pieces of new information that became available between January and August 2015, which "dramatically changed the status of the loan approval" but was not disclosed to InteliTrac. However, InteliTrac failed to cite to any evidence in support.

Regarding the situation where a defendant conveys a false impression by making a partial disclosure, InteliTrac asserted that White promised a binding commitment letter and created the false impression that he was providing such when he sent the Opportunity Memos and the September letter and that White created the false impression that the loan presentation package was complete but that system failures had prevented its consideration by the committee. These assertions, and

–21–

InteliTrac's supporting evidence, do not show that White made partial disclosures leaving a false impression. Instead, these would fall under traditional fraud, i.e. a defendant making false statements.

In support of the fourth circumstance giving rise to a duty to disclose, where a defendant who voluntarily discloses some information has a duty to disclose the whole truth, InteliTrac listed the following instances: White's statements that UMB had previewed the loan to committee members and approval would be a "rubber stamp," when that was not the case; the loan package was finalized, when it was not because it was missing the audited net present value of the contracts, which was critical; InteliTrac was advised that White was removed from the loan process but was not told it was due to his incompetence and poor performance that had been occurring since the beginning of 2015; and no one informed InteliTrac that Dustin Rall's recent loan application had been denied because he was associated with the previous Medicine Store loan. However, once again, InteliTrac failed to direct the trial court to any evidence supporting these specific instances in its argument section regarding its "omission-based claims."

Because InteliTrac failed to direct the trial court to evidence of circumstances giving rise to a duty to disclose, InteliTrac failed to meet its summary judgment burden as to its claim for fraud by omission. Therefore, the trial court did not err in granting appellees' motion on this claim.

### 3. Promissory Estoppel

"Promissory estoppel may be utilized to enforce a promise when a plaintiff justifiably and reasonably relies on the promise to his detriment, it was foreseeable that the plaintiff would rely on the promise, and injustice can only be avoided by enforcement of the promise." *Esty*, 298 S.W.3d at 305; *see also English v. Fischer*, 660 S.W.2d 521, 524 (Tex. 1983) (setting out elements of promissory estoppel as a promise, foreseeability of reliance thereon by the promisor, and substantial reliance by the promisee to his detriment). To be actionable, the promise must be sufficiently definite and "more than speculation of future events, a statement of hope, an expression of opinion, an expectation, or an assumption." *Esty*, 298 S.W.3d at 305.

Similar to its argument with respect to InteliTrac's negligent misrepresentation claim, UMB argued that InteliTrac had no evidence of a definite promise of an existing event and no evidence that it reasonably and justifiably relied on such promise. InteliTrac failed to reference any evidence in response. After setting out the elements of promissory estoppel, InteliTrac simply stated: "Plaintiff has ample evidence to establish these elements of this claim, the evidence also proves the existence of a definite promise of an existing event or Plaintiff's reasonable and justifiable reliance on same. As such, Plaintiff's claim for promissory estoppel does not fail on the merits."

InteliTrac's conclusory statement that the elements of its promissory estoppel claim were supported by evidence is insufficient to meet its summary judgment

burden and does not create a fact question on the challenged elements. *See Landero*, 2023 WL 4571925, at \*2–3. Therefore, the trial court did not err in granting UMB's motion for summary judgment as to InteliTrac's cause of action for promissory estoppel.

### 4. Conspiracy

The elements of a conspiracy claim are (1) two or more persons (2) have a meeting of the minds on (3) an object or course of action to be accomplished, (4) and there is one or more unlawful overt act taken in pursuance of the object or course of action, (5) which proximately causes damages to the plaintiff. *Parker*, 514 S.W.3d at 222. "An actionable civil conspiracy requires specific intent to agree to accomplish something unlawful or to accomplish something lawful by unlawful means." *Id.* Conspiracy is a derivative tort that depends on the commission of an underlying tort or illegal act to survive. *Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 140–42 (Tex. 2019) (relying in part on *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996)).

In their motion for summary judgment, appellees argued InteliTrac had no evidence appellees possessed specific intent to use unlawful means or to accomplish an unlawful purpose, no evidence of a meeting of the minds, and no evidence of an unlawful overt act. Appellees also argued that InteliTrac's conspiracy claim failed because it is a derivative tort that cannot survive without an underlying tort.

–24–

In its summary judgment response, InteliTrac argued, "There is also evidence of action in concert sufficient for a conspiracy. There is clearly a 'conspiracy of silence' after the loan was declined. No one knows anything." To support its argument that it produced evidence showing appellees possessed specific intent to use unlawful means or to accomplish an unlawful purpose and had a meeting of the minds, InteliTrac cited to Gunderson's affidavit as a whole. InteliTrac did not direct the trial court to specific paragraphs within Gunderson's affidavit or further argue how Gunderson's affidavit raised a fact question as to each element challenged. InteliTrac cited to no other evidence in this section of its response. While Gunderson testified about the various alleged promises and representations by UMB and its employees (most of which was excluded by the trial court on appellees' objection), we have not identified any testimony that shows a meeting of the minds between UMB employees to use unlawful means to accomplish an object or course of action.

Moreover, because we have determined that InteliTrac failed to raise a genuine issue of material fact to support each challenged element of InteliTrac's other causes of action and, thus, the trial court did not abuse its discretion in granting summary judgment on those causes of action, there is no underlying tort remaining to support InteliTrac's conspiracy claim. *See id.* at 141 ("[A] civil conspiracy claim is connected to the underlying tort and survives or fails alongside it."); *Grant Thornton*, 314 S.W.3d at 930–31 (concluding that, because fraud claim based on the same alleged misrepresentations failed, plaintiff's conspiracy claim failed as well).

–25–

Therefore, the trial court did not err in granting summary judgment in favor of appellees on InteliTrac's conspiracy claim.

## C. Summary

Having concluded the trial court did not err in granting summary judgment in favor of appellees on InteliTrac's claims for breach of fiduciary duty, constructive fraud, negligent misrepresentation, promissory estoppel, fraud, and conspiracy, which are the only causes of action at issue in this appeal, we overrule InteliTrac's first issue.

**Attorney's Fees under the DTPA**

InteliTrac argues in its second issue that UMB failed to timely seek attorney's fees under the DTPA because it did not plead for the recovery of such fees until after InteliTrac voluntarily dismissed the DTPA claim at the summary judgment hearing, after the trial court granted summary judgment, and after the deadline in the court's scheduling order. In its third issue, InteliTrac asserts that the evidence was legally insufficient to support the jury's award of $430,000 in attorney's fees. UMB responds that it had no obligation to plead a specific entitlement to attorney's fees under the DTPA because the award is mandated by the statute, but even if it did, InteliTrac cannot show it did so untimely or that InteliTrac was surprised. Further, UMB asserts that it presented expert testimony regarding the legal work performed, which overlapped in defending against the various causes of action InteliTrac asserted against it, and thus the evidence was legally sufficient to support the award.

## A. Timeliness

The trial court's third amended scheduling order, signed on October 24, 2018, provided that amended pleadings asserting new causes of action or raising new defenses shall be filed by November 1, 2018. The order further provided, "Amended pleadings responsive to timely filed pleadings under this schedule may be filed after the deadline for amended pleadings if filed within 10 days after the pleading to which they respond." InteliTrac first filed suit against appellees on January 3, 2017. UMB answered with a general denial and pleaded several defenses, as well as special exceptions. On November 1, 2018, at 4:53 p.m., InteliTrac amended its petition to include a cause of action under the DTPA. On November 1, 2018, at 5:02 p.m., UMB filed an amended answer and original counterclaim for declaratory judgment and sought attorney's fees under section 37.009 of the Texas Civil Practice and Remedies Code. UMB did not specifically plead for recovery of attorney's fees under the DTPA until it filed its first amended counterclaim on September 3, 2019, in which it alleged that InteliTrac's claims under the DTPA, filed on November 1, 2018, were "groundless, brought in bad faith and/or for the purpose of harassment." In its amended counterclaim, UMB also nonsuited its declaratory judgment action and made clear it was seeking to recover fees only under the DTPA. UMB did not seek leave of court to file its amended counterclaim after the deadlines set out in the court's scheduling order. The parties dispute whether such action was fatal to UMB's claim for attorney's fees under the DTPA.

"Absent a mandatory statute, a trial court's jurisdiction to render a judgment for attorney's fees must be invoked by pleadings, and a judgment not supported by pleadings requesting an award of attorney's fees is a nullity." *Alan Reuber Chevrolet, Inc. v. Grady Chevrolet, Ltd.*, 287 S.W.3d 877, 884 (Tex. App.—Dallas 2009, no pet.). As relevant here, the DTPA provides, "On a finding by the court that an action under this section was groundless in fact or law or brought in bad faith, or brought for the purpose of harassment, the court *shall* award to the defendant reasonable and necessary attorneys' fees and court costs." TEX. BUS. & COM. CODE ANN. § 17.50(c) (emphasis added). The phrase "the court shall award" is mandatory. *See Bocquet v. Herring*, 972 S.W.2d 19, 20 (Tex. 1998) ("Statutes providing that a party 'may recover', 'shall be awarded', or 'is entitled to' attorney fees are not discretionary."). Thus, because an award of attorney's fees under the DTPA is mandatory if the trial court makes certain findings, we agree that UMB was not required to plead for attorney's fees under the DTPA in its counterclaim. *See Martin v. Lou Poliquin Enters., Inc.*, 696 S.W.2d 180, 185 (Tex. App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.) (op. on reh'g) ("DTPA § 17.50(c) provides a mandatory award of attorney's fees to a defendant if the court finds the suit groundless, brought in bad faith, or brought for the purpose of harassment."); *see also Dunn v. Parker*, No. 06-19-00036-CV, 2019 WL 4559096, at *1, 5 (Tex. App.—Texarkana Sept. 20, 2019, no pet.) (mem. op.) (concluding it was not necessary for appellees to plead for attorney's fees in their petition because an award of attorney's fees to the prevailing

–28–

party under the Texas Theft Liability Act is mandatory); *Robinson v. Brannon*, 313 S.W.3d 860, 868–69 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (concluding it was not necessary for appellee to plead for attorney's fees because an award for attorney's fees is mandatory under the Texas Education Code when the employee is found to be immune from liability; therefore, appellee properly requested the fees after the trial court found him immune).

Even if UMB was required to plead for attorney's fees, it did so in its first amended counterclaim. We conclude that UMB's pleading was timely. Rule 63 provides in relevant part:

> Parties may amend their pleadings, [or] respond to pleadings on file of other parties . . . provided, that any pleadings, responses or pleas offered for filing . . . after such time as may be ordered by the judge . . . shall be filed only after leave of the judge is obtained, which leave shall be granted by the judge unless there is a showing that such filing will operate as a surprise to the opposite party.

TEX. R. CIV. P. 63. Although UMB did not initially seek leave of court to file its amended counterclaim, it did seek leave on October 4, 2019. The trial court did not expressly grant UMB's motion for leave; however, the trial court denied InteliTrac's motion to strike on November 18, 2019, the same day it granted UMB's motion for fees. As the supreme court has explained, "'A liberal interpretation has been given to Rule 63,' such that 'leave of court [to file a late pleading] is presumed' when it is 'considered by the trial court' and the opposing party 'has not shown surprise or prejudice.'" *Mosaic Baybrook One, L.P. v. Cessor*, 668 S.W.3d 611, 625 (Tex.

–29–

2023) (alteration in original) (quoting *Goswami v. Metro. Sav. & Loan Ass'n*, 751 S.W.2d 487, 490 (Tex. 1988)).

On this record, we cannot conclude that InteliTrac showed it was surprised or prejudiced by UMB's September 3, 2019 amended counterclaim for attorney's fees. The record shows that UMB initially made a general prayer for attorney's fees in its original answer. It subsequently amended its general request for fees to a recovery of fees in relation to its counterclaim for declaratory judgment. After InteliTrac added its DPTA claim, UMB made known to InteliTrac that it was seeking attorney's fees under the DTPA. Specifically, on March 12, 2019, in UMB's Third Supplemental Responses to InteliTrac's Request for Disclosure, UMB responded, "Pursuant to Tex. Bus. & Com. Code § 17.50(c), Defendants seek an award of their attorneys fees and expenses incurred in connection with this action given that Plaintiffs' claims are groundless, brought in bad faith, and/or instituted for the purposes of harassment." Furthermore, after the summary judgment hearing, the parties entered into the following Rule 11 agreement:

1. Based on Plaintiff's stipulation of dismissal of its breach of contract claim and the Court's subsequent Order granting summary judgment in Defendants' favor on Plaintiffs breach of contract claim, the Bank Defendants have agreed to nonsuit their Declaratory Judgment counterclaim and not pursue attorneys' fees for that claim.

2. Defendants intend to only pursue a claim for attorneys' fees under Tex. Bus. & Com. Code § 17.50(c).

3. If the Court determines that Defendants are entitled to attorneys' fees under Tex. Bus. & Com. Code § 17.50 (c), Plaintiff intends to conduct discovery regarding Defendants' request for attorneys' fees.

Defendants reserve the right to object to, or otherwise contest, such discovery efforts.

4. In consideration of the foregoing, the Parties will notify the Court that there is currently no need for a jury-trial setting, but instead a hearing to determine whether Defendants are entitled to attorney fees under Tex. Bus. & Com. Code § 17.50 (c), and then, if such a determination is made, a subsequent hearing will be held on the amount of attorney fees and costs to be awarded.

Accordingly, InteliTrac was aware of UMB's claim for attorney's fees under the DTPA as early as March 2019 and specifically knew UMB was continuing to pursue its fees when InteliTrac's signed the July 2019 Rule 11 agreement. Because InteliTrac did not show it was surprised or prejudiced by UMB's amended filing, leave of court is presumed and, therefore, UMB's amended claim for attorney's fees was not untimely.

Furthermore, to the extent InteliTrac argues that UMB could not recover fees because it did not file its pleading until after InteliTrac nonsuited the DTPA claim and/or after the trial court granted summary judgment and thus the DTPA claim was no longer pending, we reject such argument. *See Cameo Constr. Co. v. Campbell*, 642 S.W.2d 10, 12 (Tex. App.—El Paso 1982, no writ) ("The fact that [plaintiffs] by amended pleading eliminated all claims against [defendant] under the Deceptive Trade Practice Act did not totally relieve them of all liability to him if the original pleadings which asserted such a claim 'was groundless and brought in bad faith, or brought for the purpose of harassment.'" (quoting TEX. BUS. & COM. CODE § 17.50(c))). We conclude the trial court did not abuse its discretion in denying

–31–

InteliTrac's motion to strike UMB's amended counterclaim. InteliTrac's second issue is overruled.

## B. Sufficiency of Award

InteliTrac argues in its third issue that the evidence was insufficient to support an award of attorney's fees in the amount of $430,000 because only six of the approximately 470 time entries on the billing invoices described work specifically defending against the DTPA. InteliTrac contends that the amount is "manifestly unreasonable and unnecessary to defend against one claim that was only an active claim during seven months of the litigation." InteliTrac further asserts that the segregation percentage of 78%, recommended by UMB's expert, was "grossly inflated."

To recover attorney's fees, a party must present evidence of the particular services performed, when they were performed and who performed them, the reasonable amount of time required to perform such services, and the reasonable hourly rate for each person who performed the services. *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 498 (Tex. 2019). "The party seeking attorneys' fees bears the burden of proof and must supply enough facts to support the reasonableness of the amount awarded." *Yowell v. Granite Operating Co.*, 620 S.W.3d 335, 354 (Tex. 2020).

"[I]f any attorney's fees relate solely to a claim for which such fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees."

*Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313 (Tex. 2006). Whether attorney's fees were properly segregated is a mixed question of law and fact. *Id.* at 312–13. The ultimate question of whether a party is excused from segregating fees, i.e. whether the causes of action are so intertwined that they cannot be separated, is a question of law that we review de novo; however, the amount of fees necessary to prosecute such claims often turns on "judgment and credibility questions about who had to do what and what it was worth." *Id.* at 311–13. "The determination of reasonable and necessary attorneys fees is an issue generally left to the trier of fact." *Kinsel v. Lindsey*, 526 S.W.3d 411, 427 (Tex. 2017).

Aaron Tobin, UMB's expert witness, testified that he reviewed invoices, pleadings, and discovery to determine the amount of reasonable and necessary fees. He did not review legal work that was performed prior to InteliTrac adding its DTPA claim in its amended petition. Tobin testified that the factual allegations changed very little between InteliTrac's original petition and its amended petition He explained that, in this case, like many complex business cases, the same set of facts can support more than one cause of action. Relying on the *Arthur Anderson* factors, Tobin also explained that the DTPA is one of the most serious claims you can handle as a defense lawyer because a prevailing plaintiff can be awarded treble damages. *See Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997) (one factor to be considered is the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service

–33–

properly). The case was also very important because the plaintiff was seeking $50 million in damages. *See id.* (another factor that should be considered is the amount involved and the results obtained). Tobin also opined that getting an order granting summary judgment was the "best possible outcome you could hope for to get all of these claims dismissed" in motion practice instead of at trial; it was "a superior result" for a defendant. *See id.*

As to the segregation of fees, Tobin explained to the jury that there are different ways one can recover under the DTPA. One is under a laundry list of activities, most of which "involve some sort of fraudulent or deceptive means or misrepresentation or giving false statements . . . so similar words that are used and standards of proof that are used in the other claims . . . such as fraud and breach of fiduciary duty." Tobin opined that the same amount of work would have been done if InteliTrac had not amended its petition to add the DTPA claim but also a large portion, if not close to all the work done, would still have been needed if InteliTrac alleged only a DTPA claim.

The legal services Tobin reviewed included preparing and responding to discovery, such as requests for information and depositions; work related to expert discovery for damages experts and liability experts; reviewing tens of thousands of documents that were exchanged in discovery; and motion practice, specifically UMB's motion for summary judgment. If work was done for another claim and the work had nothing to do with the facts that underlined the DTPA cause of action, he

excluded it from his calculation. However, he explained, if it was so intertwined that he could not separate the work, it was counted.

Tobin calculated that the total amount of attorney's fees charged between InteliTrac's filing of the DTPA claim and the summary judgment hearing was $814,030.17. In addition to excluding tasks he determined were unrelated to the DTPA claim, Tobin subtracted 22% of each fee charged, leaving 78% of each DTPA related fee as the amount he determined to be reasonable and necessary. The 22% represented work done on the breach of contract and promissory estoppel claim and was derived by assigning 11% to each of the nine causes of action alleged; thus, two causes of action equaled 22% of the work done. Based on these calculations, Tobin opined that a reasonable and necessary fee for the work done from filing until summary judgment was $422,144.44, which was almost a 50% reduction from the fees charged during that timeframe. In addition, Tobin opined that the amount of reasonable fees and expenses charged from after the trial court granted summary judgment through trial, which related to the recovery of attorney's fees, prosecuting that claim, discovery and motion practice, pretrial proceedings, and the trial itself, was $234,341.78. The total amount that Tobin opined was reasonable and necessary for the DTPA claim was $656,486.22. He explained that this amount was roughly 40% of the $1,615,176 in total fees and expenses charged in the case.

On cross-examination, InteliTrac's counsel questioned Tobin about how UMB's counsel block billed multiple tasks per day instead of billing by individual

task and pointed out that there were ten to fifteen billers on the case. Tobin reiterated that "if there was an entry that had nothing to do with the DTPA and the time . . . spent would not also apply to helping defend against the DTPA case, then those entries [we]re not included in the opinion." InteliTrac's counsel also questioned Tobin regarding the work done related to the DTPA claim in UMB's motion for summary judgment. Tobin agreed that the summary judgment argument was limited to whether InteliTrac was a consumer and whether the transaction was over $500,000, which by way of example did not overlap with the argument presented regarding InteliTrac's claim for breach of fiduciary duty, as that argument was limited to whether a fiduciary relationship existed at all. Tobin also went on to explain that, although specific arguments may not have been made in UMB's summary judgment motion that were related to other claims, there had to be factual discovery done to determine whether the transaction was of the type of transaction that is excluded from the DTPA.

On re-direct, Tobin testified that UMB's lead attorney rate was $550 per hour and that amount was reasonable considering the attorney was a sophisticated business trial lawyer. Tobin also testified that the other attorneys' rates were reasonable. As to his segregation analysis, Tobin maintained that the same set of facts was applicable to everything, so in terms of discovery and depositions UMB was seeking facts related to the other claims as well. He opined that, generally, recoverable fees would rarely be documented by an entry only noting the DTPA.

InteliTrac's attorney, Clay Townsend, testified on behalf of InteliTrac, although he was not designated as an expert witness and, thus, was not permitted to opine to a specific amount of attorney's fees that would be reasonable and necessary. Townsend testified that by the time the DTPA claim had been filed, most of the facts had been developed; thus, it was not the factual elements that required a lot of work to produce the motion for summary judgment, it was the legal research and arguments. He explained that his firm breaks down the claims they are researching by claim and element; they do not block bill as UMB's attorneys did. He emphasized that out of 470 entries, UMB's attorneys' invoices contained only one reference to the DTPA, and it was in the middle of a block bill for March 12, 2019. In his opinion, because only the DTPA fee could be recovered, the amount awarded in attorney's fees should be limited to one-ninth, not seven-ninths as Tobin testified.

Our first task in determining whether the attorney's fees award was supported by legally sufficient evidence is to determine whether UMB's expert properly segregated the fees. In its amended petition, InteliTrac alleged that UMB committed violations of the DTPA by its:

> . . . unconscionable course of conduct for nearly one year in dealing with [InteliTrac]'s loan, in falsely inducing [InteliTrac] to not seek alternative sources of financing, by concealing that there were strong personal feelings of animus against associates of [InteliTrac] which had nothing to do with underwriting the loan, and in failing to disclose that there were pre-requisites and conditions to approving the loan which were concealed from, or never communicated to, [InteliTrac].

Thus, InteliTrac's DTPA claim generally alleged that UMB committed violations of the DTPA by making material false representations, committing fraud, or committing fraud by nondisclosure. As detailed above in our review of the trial court's summary judgment ruling, these are the same allegations contained within InteliTrac's claims for negligent misrepresentation and fraud, and subsumed within its conspiracy claim. In addition, although not addressed in the summary judgment arguments, InteliTrac's claims for breach of fiduciary duty and breach of good faith and fair dealing alleged that UMB failed to disclose known facts concerning its Financial Chairman and CEO Mariner Kemper's motives (to not do business with Gunderson because of his association with the Medicine Store loan) and that UMB never intended to fund the loan. Likewise, InteliTrac's claim for constructive fraud alleged UMB failed to disclose the personal animus Kemper held against InteliTrac associates, grossly mishandled the loan application and presentation, concealed critical information needed for loan approval, and induced InteliTrac to not seek alternative financing. InteliTrac's negligence claim broadly alleged that UMB's conduct constituted negligence. Therefore, we agree with UMB that the same underlying facts applied to all claims alleged by InteliTrac, including the DTPA claim.[5]

---

[5] We do not consider InteliTrac's claims for breach of contract or promissory estoppel here because UMB's expert already removed the percentage of time worked on these claims from its overall amount requested.

However, the fact that the claims are "all 'dependent upon the same set of facts or circumstances,' . . . does not mean they all required the same research, discovery, proof, or legal expertise." *Chapa*, 212 S.W.3d at 313 (quoting *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 11 (Tex. 1991)). The Supreme Court has explained:

> . . . . To the extent *Sterling* suggested that a common set of underlying facts necessarily made all claims arising therefrom "inseparable" and all legal fees recoverable, it went too far.
>
> But *Sterling* was certainly correct that many if not most legal fees in such cases cannot and need not be precisely allocated to one claim or the other. Many of the services involved in preparing a contract or DTPA claim for trial must still be incurred if tort claims are appended to it; adding the latter claims does not render the former services unrecoverable. Requests for standard disclosures, proof of background facts, depositions of the primary actors, discovery motions and hearings, *voir dire* of the jury, and a host of other services may be necessary whether a claim is filed alone or with others. To the extent such services would have been incurred on a recoverable claim alone, they are not disallowed simply because they do double service.
>
> . . . . Intertwined facts do not make tort fees recoverable; it is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated.

*Id.* at 313–14.

From our review of Tobin's testimony and the invoices presented to the jury, we characterize the discrete legal services performed as follows: discovery related tasks, preparing for a jury focus group and mock trial, and summary judgment related tasks. Because the underlying facts apply to each of InteliTrac's claims and because many of the claims have similar, if not identical elements, we agree that counsels'

–39–

discovery related tasks and preparation for the jury focus group and mock trial would have been necessary even if the DTPA claim had been the sole cause of action alleged. This is so due to the role of discovery and mock trial—to discover and document the underlying facts at issue and to prepare and practice the case presentation before ultimately trying the case to a jury.

The same cannot always be said of preparing a motion for summary judgment, however, because it is the succinct legal arguments advanced in the motion that generally make up the bulk of the service provided. As illustrated in this case, a party may choose to attack individual elements of the various causes of action in order to show it is entitled to summary judgment. Thus, although compiling the factual background section could be considered work advancing both recoverable and unrecoverable claims, the work performed in drafting specific arguments to attack certain elements of each individual claim would likely not advance both the recoverable claims and the nonrecoverable claims.

Here, the bulk of UMB's argument as to why it was entitled to summary judgment on InteliTrac's DTPA claim was limited to whether InteliTrac was a consumer under the DTPA and whether the DTPA could apply to the transaction when it was for an amount over $500,000. These specific DTPA related arguments made up approximately two pages of UMB's forty-three-page motion. Its reply to InteliTrac's response regarding the DTPA claim spanned only one-and-one-half pages. Although UMB included argument and legal authority related to the DTPA

in its global assertions that the statute of frauds barred InteliTrac's claims and that InteliTrac could not prove causation, none of its other arguments (such as no fiduciary relationship, no recovery of economic damages in a negligence claim, no existing fact was misrepresented, no justifiable reliance, no intent to deceive or not perform, no duty to disclose, and no meeting of the minds) advance UMB's defense of the DTPA claim.

UMB's attorneys were not required to keep separate time records when they drafted the different sections of the motion for summary judgment or their reply to InteliTrac's response; "an opinion would have sufficed stating" the percentage of drafting time spent on the arguments related to the DTPA claim. *Id.* at 314. UMB attempted to do this by deducting 22% from the amount charged for each of the discrete legal services for which it was seeking recovery (11% for the breach of contract claim and 11% for the promissory estoppel claim). But the arguments advanced in UMB's motion for summary judgment to defeat InteliTrac's DTPA claim were not so intertwined that they could not be segregated from its arguments relating to all the other claims. Instead, UMB's arguments to defeat the DTPA were unique to the DTPA and applied to no other claims, just as UMB's arguments to defeat specific elements of the other claims were unique to those claims and did not apply to the DTPA claim. *See, e.g.*, *Kinsel*, 526 S.W.3d at 427–28 (upholding court of appeals determination that claims were distinct and fees must be segregated even where the facts basically related to each cause of action because the facts necessary

to prove each claim did not overlap where some claims addressed the status of the decedent's mental abilities and others depended on a showing that defendants made false statements upon which plaintiffs relied).

Thus, more time and fees should have been subtracted from UMB's attorneys' work done on the motion for summary judgment and the reply motion. Also, because InteliTrac nonsuited the DTPA claim at the summary judgment hearing, no legal services performed at the hearing could have advanced UMB's defense of the DTPA claim. Therefore, it too should have been excluded from Tobin's calculation.

Generally, we would end our inquiry with the conclusion that the party seeking fees did not properly segregate them and remand the issue of attorney's fees to the trial court for reconsideration. *See id.* at 428; *Chapa*, 212 S.W.3d at 314 ("Unsegregated attorney's fees for the entire case are some evidence of what the segregated amount should be."); *Allan v. Nersesova*, 307 S.W.3d 564, 573 (Tex. App.—Dallas 2010, no pet.) (op. nunc pro tunc) ("The remedy for unsegregated attorney's fees is a new trial on the issue, not rendition of a take-nothing judgment on the claim for attorney's fees."). However, the jury in this case did not award the full amount of fees requested by UMB. Instead, the jury further subtracted $226,486.21 from the $656,486.21 opined by Tobin. Our review of the evidence shows that approximately $75,000 of that amount was for summary judgment related tasks. Thus, even if UMB had not included any of its summary judgment work in

its requested amount, the jury still reduced its requested fee amount by another $153,339.14.

Because the jury found that UMB was entitled to attorney's fees for less than the amount Tobin opined was reasonable and necessary and less than the amount accounting for the work that should have been further segregated from the summary judgment related tasks, we cannot conclude that the jury's finding of $430,000 was for legal services performed that were not properly segregated.

As to InteliTrac's general claim that the fees awarded were unreasonable and unnecessary to defend against the DTPA claim, which was only active for seven months, we must defer to the jury's determination. *See Kinsel*, 526 S.W.3d at 427 ("The determination of reasonable and necessary attorneys fees is an issue generally left to the trier of fact."); *Chapa*, 212 S.W.3d at 313 (the amount of necessary fees often turns on "judgment and credibility questions about who had to do what and what it was worth"). At trial, InteliTrac presented no evidence of what specific amount constituted a reasonable and necessary award. Although InteliTrac's counsel testified that one-ninth of the fees charged would be appropriate, we have determined that many of the services performed did not require such segregation. InteliTrac did not further challenge Tobin's testimony as to the reasonable rates of the attorneys or the amount of hours generally billed for the services. It was within the jury's province to weigh Tobin's testimony and determine that $430,000 was a reasonable and necessary amount of attorney's fees for defending against the DTPA

claim. Such award was supported by Tobin's testimony and the detailed invoices presented. Therefore, the jury's finding, and the trial court's award, of attorney's fees is supported by legally sufficient evidence. InteliTrac's third issue is overruled.

## Conclusion

Having overruled each of InteliTrac's three issues on appeal, we affirm the judgment of the trial court.

/Robert D. Burns, III/
ROBERT D. BURNS, III
220635F.P05                     CHIEF JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

INTELITRAC, INC., Appellant

No. 05-22-00635-CV        V.

UMB FINANCIAL
CORPORATION, UMB BANK,
N.A., ZACH FEE, NICK
ARTHACHINDA, AND KEVIN
VON ATZIGEN, Appellees

On Appeal from the 95th District
Court, Dallas County, Texas
Trial Court Cause No. DC-17-00035.
Opinion delivered by Chief Justice
Burns. Justices Carlyle and Kennedy
participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellees UMB FINANCIAL CORPORATION, UMB BANK, N.A., ZACH FEE, NICK ARTHACHINDA, and KEVIN VON ATZIGEN recover their costs of this appeal from appellant INTELITRAC, INC.

Judgment entered this 19th day of March 2024.